*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0363P (6th Cir.)
File Name: 01a0363p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————————

REYNERO ARTEAGA
CARBALLO,
          *Petitioner-Appellant,*

          *v.*                                    No. 99-5698

MARK LUTTRELL, Warden;
IMMIGRATION AND
NATURALIZATION SERVICE,
          *Respondents-Appellees.*

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 98-03081—Julia S. Gibbons, District Judge.

Submitted: March 9, 2001

Decided and Filed: October 11, 2001

Before: KRUPANSKY, BOGGS, and BATCHELDER,
Circuit Judges.

————————————————

**COUNSEL**

**ON BRIEF:** Mark C. Walters, Loreto S. Geisse, UNITED
STATES DEPARTMENT OF JUSTICE, OFFICE OF
IMMIGRATION LITIGATION, CIVIL DIVISION,

1

Washington, D.C., for Appellees.  Reynero Arteaga Carballo, Phoenix, Arizona, pro se.

---

## OPINION

---

ALICE M. BATCHELDER, Circuit Judge.  Petitioner Reynero Arteaga Carballo, a Cuban citizen and national presently detained at the Federal Correctional Institution at Memphis, whom the Immigration and Naturalization Service ("INS") adjudged excludable, filed a pro se petition for a writ of habeas corpus under 28 U.S.C. § 2241.  Petitioner challenges the Attorney General's constitutional and statutory authority to continue his detention indefinitely following his completion of a state court sentence and transfer to federal custody to effect his deportation, which cannot occur in the foreseeable future because of the state of relations between the United States and Cuba.  Further, Petitioner argues that his detention under these circumstances violates international law.  Because Carballo raised substantially the same arguments in a prior petition, the district court ruled that the law of the case doctrine precluded reaching the merits of Petitioner's claims.  This timely appeal followed.  We will affirm the judgment of the district court, but for substantially different reasons.

### I.  Statement of Facts

#### A.  *The 1980 Mariel Boatlift*

Carballo came to the United States as one of the more than 125,000 undocumented Cuban nationals who arrived during the "Freedom Flotilla," originating at the Cuban harbor of Mariel.  In early April 1980, approximately 10,800 Cuban citizens claimed status as political refugees and sought sanctuary in the Peruvian embassy in Havana.  *United States v. Frade*, 709 F.2d 1387, 1389 (11th Cir. 1983).  On April 14, 1980, President Carter declared that up to 3,500 of those refugees would be admitted to the United States pursuant to

the Refugee Act of 1980 and allocated $4.25 million for their resettlement. *Id.* (citing 45 Fed. Reg. 28,079 (Apr. 28, 1980)). Within three days of this announcement, Castro halted flights to the United States and declared that anyone wishing to leave the island could do so through the harbor of Mariel. *Id.* The exodus of more than 125,000 Cubans, who crossed the ninety miles of ocean between Cuba and the United States in nearly 1,800 boats, followed. *Alonso-Martinez v. Meissner*, 697 F.2d 1160, 1161 (D.C. Cir. 1983).

Most of the Mariel Cubans arrived without visas or documents allowing them legal entry into the United States. *Fernandez-Roque v. Smith*, 734 F.2d 576, 578 (11th Cir. 1984). Immigration officials detained these aliens at the border and decided to exclude them from the United States.[1] About 25,000 of the arriving aliens confessed to some criminal history in Cuba, and immigration officials deemed roughly 2,000 of them to have backgrounds serious enough to warrant continued detention. *Palma v. Verdeyen*, 676 F.2d 100, 101 (4th Cir. 1982). The Attorney General paroled the remainder into the United States pursuant to his broad discretion under 8 U.S.C. § 1182(d)(5)(A). Though no longer detained, the Cubans retained their legal status as excluded aliens subject to deportation. *Fernandez-Roque*, 734 F.2d at 579. By the summer of 1981, 122,000 Cuban aliens had been paroled. *Palma*, 676 F.2d at 101 n.1.

Despite Cuba's initial refusal to accept the return of the Mariel refugees, *Fernandez-Roque*, 734 F.2d at 578, the United States has consistently taken the position that

---

[1] Immigration law draws a fundamental distinction between excludable aliens, those who seek admission but have not been granted entry to the United States and are considered detained at the border as a matter of law, and deportable aliens, those who have gained entry to the United States, whether legally or illegally. *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 159 & n.5 (1993). Since enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 ("IIRIRA"), "excludable" aliens are now denominated "inadmissible," and a process of "removal" has replaced "deportation." 8 U.S.C. §§ 1182 & 1229a.

international law obligates Cuba to accept its nationals denied admission to the United States. *Gisbert v. United States Attorney Gen.*, 988 F.2d 1437, 1439 n.4 (5th Cir. 1993). On December 14, 1984, Cuba agreed to the return of 2,746 named Mariel refugees at a rate of one hundred per month in exchange for resumption of the normal processing of preference immigration visas for Cuban nationals as had occurred in this country prior to the Mariel boatlift. *Garcia-Mir v. Smith*, 469 U.S. 1311, 1312 (1985) (Rehnquist, Circuit Justice). This list comprises individuals whom the INS identified as possessing serious criminal backgrounds or mental infirmities and does not, in the estimation of the State Department, constitute a definitive or final group selected for repatriation. *Alvarez-Mendez v. Stock*, 746 F. Supp. 1006, 1010 (C.D. Cal. 1990), *aff'd*, 941 F.2d 956 (9th Cir. 1991). Cuba suspended the agreement in May 1985, but agreed at the end of 1987 to reinstate it. *Gisbert*, 988 F.2d at 1439 n.4. In 1994 and 1995 the United States concluded additional agreements on migration matters with Cuba, and the two nations have further agreed to additional discussions and have undertaken ongoing negotiations over the return of Cuban nationals excludable from the United States. As of February 4, 1999, the United States has returned nearly 1,400 aliens named on the 1984 list to Cuba.

The Attorney General has promulgated regulations providing for annual review of the cases of Mariel Cubans who remain in custody pending deportation or removal to determine their suitability for immigration parole. 8 C.F.R. § 212.12 (2001). This process includes examination of each alien's records and an interview by special review panels. *Id.* § 212.12(d)(4). Before recommending immigration parole a review panel must conclude, based on consideration of the alien's record of criminal behavior, institutional disciplinary record, mental health history, and ties to the United States, that a detainee is: (1) nonviolent, (2) likely to remain nonviolent, (3) unlikely to pose a threat to the community upon release, and (4) not likely to violate any conditions of parole. *Id.* § 212.12(d)(2) & (3). The review panels make recommendations to the INS's Associate Commissioner for

obstacle to the[7] potentially indefinite detention of an excludable alien.[7]

Even under the more generous standard of *Sanders* for determining whether a court can consider a second or successive petition for a writ of habeas corpus, Carballo, then, cannot establish that a change in the law has intervened so as to allow our consideration of his petition under the "ends of justice" component of the standard. Since the United States District Court for the Northern District of Texas previously rejected on the merits a petition asserting the same grounds for relief, the *Sanders* standard accords that petition preclusive weight. *Sanders*, 373 U.S. at 15; *Lonberger*, 808 F.2d at 1173.

## V.  Conclusion

Whether we apply the standard of *Sanders* or the gatekeeping provisions of the AEDPA, Petitioner's application for a writ of habeas corpus constitutes a second petition, and our consideration of it is barred. Therefore, we affirm the judgment of the district court.

---

[7] We note that Justice Kennedy filed a dissent in *Zadvydas* in which he suggested that our decision in *Rosales-Garcia*, which he deemed to employ reasoning "remarkably similar to the majority's," "would seem a necessary consequence" of the majority's opinion. 121 S. Ct. at 2513 (Kennedy, J., dissenting). In light of the affirmation of *Mezei* and the Court's express disavowal in *Zadvydas* that its analysis in any way applied to excludable aliens, we respectfully disagree with Justice Kennedy's suggestion.

Put another way, the Court in *Zadvydas* declined to extend the analysis of *Mezei*, which concerned the indefinite detention of an excludable alien, to aliens who have already attained entry into the United States. For this reason, the *Zadvydas* Court recognized that *Mezei* embodies "a basic territorial distinction" that precluded the government from relying on the case when defending the constitutionality of the indefinite detention of *resident* aliens. *Id.* at 2501. Because the Court concluded that the status of an alien does have constitutional significance, it declined to entertain arguments that subsequent developments in the law had undermined the authority of *Mezei*. *Id.*

### 5. *Application of the Sanders Standard*

From the Supreme Court's discussion in *Mezei* of the constitutional principles implicated by indefinite detention of aliens, two things are clear. First, the Court regards the distinction between excludable and deportable aliens in immigration law as having constitutional significance. *Id.* at 2500-01. Moreover, from a constitutional perspective, everything turns on this distinction because once an alien enters the United States "the legal circumstance changes, for the Due Process Clause applies[.]" *Id.* at 2500. On this point the Court's opinion in *Zadvydas* is fundamentally at odds with this court's decision in *Rosales-Garcia*, which emphasized that "aliens—even excludable aliens—are 'persons' entitled to the Constitution's most basic protections and strictures" and which "emphatically reject[ed] the government's premise that excludable aliens are completely foreign to the Fifth Amendment of the Constitution." 238 F.3d at 721. Second, *Mezei* remains good law, and its principles continue to govern the constitutional analysis of the indefinite detention of excludable aliens. *Zadvydas*, 121 S. Ct. at 2495, 2500-01. This conclusion also conflicts with the position this court took in *Rosales-Garcia* limiting *Mezei* to its facts. 238 F.3d at 719-21. For these reasons, we conclude that our prior decision in *Rosales-Garcia* cannot survive the Supreme Court's decision in *Zadvydas* and that under the analysis of *Mezei* the Fifth Amendment does not present an

Enforcement ("Associate Commissioner"), who exercises authority to grant immigration parole in his discretion. *Id.* § 212.12(b) & (d)(4)(iii).

Cuba's reinstatement of the 1984 agreement in 1987 and the subsequent resumption of repatriations sparked riots among detained Mariel Cubans, resulting in at least one death and damages exceeding $100 million. *Padron-Baez v. Warden, FCI, Fairton*, No. 95-320, 1995 WL 419799, at *1 (D.N.J. July 10, 1995). As a result, on December 28, 1987, the Attorney General authorized a single, additional review of suitability for immigration parole by an independent panel within the Department of Justice for Mariel Cubans detained. 8 C.F.R. § 212.13 (1999) (removed from the Code of Federal Regulations by Exec. Order No. 12,988, 65 Fed. Reg. 80,294 (Dec. 21, 2000)). Presently, the United States holds approximately 1,750 Mariel Cubans in detention. *Chi Thon Ngo v. INS*, 192 F.3d 390, 395 (3d Cir. 1999).

### B. *Petitioner's Criminal History*

As far as state and federal authorities have been able to ascertain, Carballo's criminal record in Cuba consists of: (1) a six-month prison term in 1973 for being a Jehovah's Witness;[2] (2) a three-month period of detention for desertion from the army in 1975; and (3) his 1980 attempt to enter the Peruvian embassy. The Castro government issued Carballo exit documents, and he arrived in Florida with the wave of Mariel refugees on May 4, 1980. After a brief detention, the INS placed Carballo on immigration parole.

Almost immediately upon his release into the United States, Carballo developed a criminal record. His first arrest came on August 28, 1980, in Dade County, Florida, for grand larceny, carrying a concealed weapon, and carrying an unlicensed firearm. Although these charges were dismissed, Carballo's criminal record continued to grow, comprising at least sixteen

---

[2] Some evidence in the record indicates that Carballo adopted this faith to aid his avoidance of military service in Cuba.

arrests by early 1983 for crimes such as aggravated assault, burglary, battery, trespassing, and possession of marijuana. In April 1983, a Florida court found Carballo guilty of attempted first-degree murder, aggravated assault with a deadly weapon, and robbery and imposed a sentence of eight years imprisonment for attempted murder, eight years for robbery, and five years for aggravated assault.

During Carballo's imprisonment, the INS conducted an investigation, revoked his immigration parole, and determined to commence exclusion proceedings upon his release from state custody. In February 1994, the INS formally initiated exclusion proceedings, which an immigration judge concluded later that year. The immigration judge ordered Carballo excluded and deported for, among other things, having been convicted of a crime of moral turpitude and of two or more offenses carrying an aggregate sentence of imprisonment exceeding five years. Carballo did not appeal this decision. Since his release from state custody, the INS has detained Carballo.

While in federal custody Carballo has developed a sizable disciplinary record. Incident reports show that he has committed assault, threatened bodily harm to a staff member, trespassed in an unauthorized area, and possessed marijuana.

Pursuant to the regulations governing Mariel Cubans, the INS has reviewed Carballo's case approximately annually to determine his suitability for immigration parole into the United States. On each occasion, the reviewing panel recommended against parole due to Carballo's lengthy criminal record, ongoing disciplinary problems, his apparent disregard for his criminal history, and his minimal participation in various programs in prison. Accordingly, the Associate Commissioner of the INS has to date denied Carballo parole. Neither Petitioner nor the government believes that Carballo's name appears on the 1984 list of Mariel Cubans whom Cuba agreed to repatriate; but, because that document remains classified, *Center for Nat'l Sec. Studies v. Department of State*, No. 86-295, 1987 WL 17065

*Id.* at 2495 (emphasis added).

When the Court discussed the constitutional principles guiding its decision, it discussed *Mezei* at length and concluded that the case offered the government no support. *Id.* at 2500-01. But, unlike *Rosales-Garcia* and *Rodriguez-Fernandez*, which read *Mezei* as a relic of the Cold War, the Supreme Court in *Zadvydas* affirmed the vitality of the case—at least for excludable aliens:

> Although *Mezei*, like the present cases, involves indefinite detention, it differs from the present cases in a critical respect . . . . His presence on Ellis Island did not count as entry into the United States. Hence, he was "treated," for constitutional purposes, "as if stopped at the border." [*Mezei*, 345 U.S.] at 213, 215. And that made all the difference.

*Id.* at 2500. Turning to the fundamental difference in immigration law between excludable and deportable aliens, the Court recognized that this distinction has constitutional significance. "It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders." *Id.* (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990), and *Johnson v. Eisentrager*, 339 U.S. 763, 784 (1950)). Furthermore, "once an alien enters the country, the legal circumstance changes, for the Due Process clause applies to all 'persons' within the United States, including aliens . . . ." *Id.* at 2500-01 (citations omitted). Since the law regards excludable aliens as standing outside our borders, the Fifth Amendment can offer them no protections.[6]

---

[6] We do not, of course, mean to imply that the United States has license to torture or summarily execute excludable aliens. *See, e.g.*, *Zadvydas*, 121 S. Ct. at 2505-06 (Scalia, J., dissenting) (concluding that while excludable aliens cannot be tortured or subjected to hard labor without a judicial trial, "neither prohibition has anything to do with their right to be released into the United States."); *accord Lynch v. Cannatella*, 810 F.2d 1363 (5th Cir. 1987) and *Rodriguez-Fernandez*, 654 F.2d 1382.

*Id.* at 726-27. In short, *Rosales-Garcia* rests upon two critical assumptions: (1) the distinction in immigration law between excludable and deportable aliens has no constitutional significance; and (2) *Mezei* no longer controls the constitutional analysis of indefinite detention, at least for excludable aliens.

### 4. The Supreme Court's Decision in Zadvydas v. Davis

After this court decided *Rosales-Garcia*, the Supreme Court considered the constitutionality of the indefinite detention of resident aliens in *Zadvydas v. Davis*, 121 S. Ct. 2491 (2001). Announcing that construction of an ambiguous post-IIRIRA statute to authorize indefinite detention would raise serious constitutional problems, the Court read 8 U.S.C. § 1231(a)(6) as limiting post-removal-period detention "to a period reasonably necessary to bring about that alien's removal from the United States." *Id.* at 2498. The Court reasoned that because the Due Process Clause of the Fifth Amendment applies to all persons within the United States, whether in the country legally, illegally, temporarily, or permanently, "[t]he serious constitutional problem arising out of a statute that, in these circumstances, permits an indefinite, perhaps permanent, deprivation of human liberty without [adequate procedural protections] is obvious." *Id.* at 2500.

The statute before the Court in *Zadvydas*—section 1231(a)(6)—is not the statute at issue in this case. Interpreting section 1231(a)(6), the *Zadvydas* Court concluded that indefinite detention of a resident alien would pose serious constitutional problems, but carefully distinguished the situation of excludable aliens, whom the law regards as standing at—but outside—the border. At the outset of the opinion, the Court limited the issue before it so as to except excludable aliens from its analysis:

> We deal here with aliens who were admitted to the United States but subsequently ordered removed. *Aliens who have not yet gained initial admission to the country would present a very different question.*

(D.D.C. Aug. 27, 1987), the record provides no definitive evidence on the matter.

### C. Carballo's First Habeas Petition

On September 6, 1990, Carballo filed a pro se petition for a writ of habeas corpus under 28 U.S.C. § 2241 in the United States District Court for the Northern District of Texas. This petition challenged the authority of the Attorney General to continue the detention of an excludable alien after passage of a reasonable time to effect deportation. Additionally, Carballo argued that the continued denial of immigration parole occurred without due process of law and that international law prohibited the conditions and duration of his confinement.

Recognizing the plenary power of the political branches over immigration matters, a magistrate judge recommended denial of Carballo's petition on the ground that protection of the American public justified his continued confinement. Further, the magistrate judge reasoned that Carballo had regularly received all the process to which he is due through the INS's periodic review of his case pursuant to the Mariel regulations. Finally, the magistrate judge concluded that promulgation of these regulations displaced the public law of nations so that international law did not control Carballo's case. On November 26, 1991, the district court accepted the recommendation of the magistrate judge and entered an order denying Carballo's petition for a writ of habeas corpus. This order became final when Carballo failed to appeal.

## II. Jurisdiction and Standard of Review

Under 28 U.S.C. § 2241 a petitioner may file a petition for a writ of habeas corpus in the district court having jurisdiction over his custodian. *Charles v. Chandler*, 180 F.3d 753, 756 (6th Cir. 1999) (per curiam). 8 U.S.C. § 1252(g) provides:

> Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of

any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

Notwithstanding this broad language, which on its face would appear to preclude judicial review of a habeas petition filed by an alien in Carballo's circumstance absent congressional direction to the contrary, the Supreme Court has concluded that section 2241 confers jurisdiction upon the federal courts to entertain statutory and constitutional challenges to an alien's detention following entry of an order of removal. *Zadvydas v. Davis*, 121 S. Ct. 2491, 2497-98 (2001). Therefore, we have jurisdiction to entertain Petitioner's appeal. We review the denial of a petition for a writ of habeas corpus de novo and the district court's factual findings for clear error. *Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir. 1998) (footnote omitted).

Based on the 1990 decision of a coordinate court, the district court invoked the law of the case doctrine and dismissed Carballo's petition. On appeal, Respondents urge affirmance on this ground or, in the alternative, on the ground that Carballo has not demonstrated cause and prejudice to justify consideration of a successive and abusive petition. We turn first to the ground on which the district court denied Carballo's petition.

### III. Law of the Case Doctrine

"Under the doctrine of the law of the case, a decision on an issue made by a court at one stage of a case should be given effect in successive stages of the same litigation." *United States v. Todd*, 920 F.2d 399, 403 (6th Cir. 1990) (citing *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988)). Operation of this doctrine depends upon whether a court previously decided on a rule of law. *Christianson*, 486 U.S. at 817. Accordingly, the doctrine only applies to identical issues decided explicitly or by necessary inference. *Hanover Ins. Co. v. American Eng'g Co.*, 105 F.3d 306, 312 (6th Cir. 1997). Additionally, it applies with as

court recognized that the Supreme Court had subsequently extended "to aliens basic Fifth, Sixth, and Fourteenth Amendment protections." *Id.* at 719. Second, the court limited *Mezei* to its facts by emphasizing the national security aspect of the case and the background of the Korean War. *Id.* at 719-21. Based on this reading of *Mezei*, the court "emphatically reject[ed] the government's premise that excludable aliens are completely foreign to the Fifth Amendment of the Constitution." *Id.* at 721. Because the INS could neither execute nor torture an excludable alien constitutionally, the court declined "to draw a line of constitutional dimension between the act of torturing an excludable alien and the act of imprisoning such an alien indefinitely" because "aliens—even excludable aliens—are 'persons' entitled to the Constitution's most basic protections and strictures." *Id.*

Having then proceeded to the conclusion that the indefinite detention of an excludable alien violates the Due Process Clause of the Fifth Amendment, *id.* at 726-27, the court announced a test for determining whether the federal government's diplomatic efforts with an alien's home nation suffice to justify continued detention. *Id.* at 725. Notwithstanding the Tenth Circuit's abrogation of its decision in *Rodriguez-Fernandez*, the court concluded by adopting the reasoning of that case in support of its holding:

> We agree with the Tenth Circuit that when an alien's home country refuses to accept him, it appears that "detention is [] used as an alternative to exclusion rather than a step in the process of returning petitioner to his native Cuba." *Rodriguez-Fernandez v. Wilkinson*, 654 F.2d 1382, 1386 (10th Cir. 1981); *cf. Chi Thon Ngo*, 192 F.3d at 398 ("It is [] unrealistic to believe that these INS detainees are not actually being 'punished' in some sense for their past conduct."). We conclude, therefore, that Rosales's detention has crossed the line from permissive regulatory confinement to impermissible punishment without trial.

fiction applied to these cases that detention is only a continuation of the exclusion.

*Id.* at 1387 (footnote omitted). Further, the court did not regard *Mezei* as controlling because of the particular facts presented there, namely the national security risks attending the Korean War and the government's continuing efforts to deport Mezei. *Id.* at 1388. Because of the serious constitutional issues lurking in the background, the court preferred to decide Rodriguez-Fernandez's petition on statutory grounds. *Id.* at 1389-90.

Subsequent promulgation of the Mariel regulations and Congress's enactment of former section 1226(e) in the Immigration Act of 1990 have abrogated the Tenth Circuit's holding in *Rodriguez-Fernandez*. Not only have several other circuits so recognized, *e.g.*, *Carrera-Valdez*, 211 F.3d at 1048, but the Tenth Circuit itself recently disavowed the constitutional analysis of *Rodriguez-Fernandez* as dicta on this basis. *Ho*, 204 F.3d at 1057.

### 3. Rosales-Garcia

In *Rosales-Garcia v. Holland*, 238 F.3d 704 (6th Cir. 2001) (2-1 decision), this court reversed the district court's denial of a habeas petition brought by a Mariel Cuban.[5] After concluding that former section 1226(e) expressly granted the Attorney General the authority to detain an excludable alien indefinitely, *id.* at 715-16, the court discounted the government's reliance on *Mezei* for two reasons. First, the

---

[5]Prior to the decision in *Rosales-Garcia*, this circuit had upheld the constitutionality of indefinite detention only in unpublished opinions of no precedential value. *See Garcia-Arena v. Luttrell*, No. 99-6505, 2000 WL 1827855 (6th Cir. Dec. 8, 2000); *Betancourt v. Chandler*, No. 99-5797, 2000 WL 1359634 (6th Cir. Sept. 14, 2000); *Laetividad v. INS*, No. 99-5245, 1999 WL 1282432 (6th Cir. Dec. 27, 1999); *Fernandez-Santana v. Chandler*, No. 98-6453, 1999 WL 1281781 (6th Cir. Dec. 27, 1999); *Marrero-Montes v. United States*, No. 98-5378, 1998 WL 808255 (6th Cir. Nov. 10, 1998); *Gonzalez v. Luttrell*, No. 96-5098, 1996 WL 627717 (6th Cir. Oct. 29, 1996).

much force to the decisions of a coordinate court as to a court's own decisions. *Christianson*, 486 U.S. at 816.

Rather than constituting a limit to judicial power, the doctrine expresses the general practice of courts to refuse to revisit settled matters. *Messinger v. Anderson*, 225 U.S. 436, 444 (1912); *Petition of U.S. Steel Corp.*, 479 F.2d 489, 494 (6th Cir. 1973). These principles govern when the doctrine operates to give effect to the judgment of the same or a coordinate court; they "never block[] a higher court from examining a decision of an inferior tribunal." *In re Reliable Drug Stores, Inc.*, 70 F.3d 948, 951 (7th Cir. 1995). *See also Christianson*, 486 U.S. at 817-18 (explaining that "a district court's adherence to law of the case cannot insulate an issue from appellate review"). Nor can law of the case doctrine bind an appellate court in reviewing the decisions of a lower court. *Christianson*, 486 U.S. at 817. Nonetheless, we have held that when a party fails to appeal a prior decision the doctrine will bar appellate review at a successive stage of the litigation:

The law-of-the-case doctrine bars challenges to a decision made at a previous stage of the litigation which could have been challenged in a prior appeal, but [was] not. *See County of Suffolk v. Stone & Webster Eng'g Corp.*, 106 F.3d 1112, 1117 (2d Cir. 1997). A party who could have sought review of an issue or a ruling during a prior appeal is deemed to have waived the right to challenge that decision thereafter, for "it would be absurd that a party who has chosen not to argue a point on a first appeal should stand better as regards the law of the case than one who had argued and lost." *Fogel v. Chestnutt*, 668 F.2d 100, 109 (2d Cir. 1981).

*United States v. Adesida*, 129 F.3d 846, 850 (6th Cir. 1997).

Federal law treats each petition for a writ of habeas corpus as a separate civil action, rather than as a continuation of the criminal appeals process. *See, e.g.*, *United States v. Morgan*, 346 U.S. 502, 505 n.4 (1954) ("[The writ of error *coram nobis*] is a step in the criminal case and not, like habeas

corpus where relief is sought in a separate case and record, the beginning of a separate civil Proceeding.") (citing *Kurtz v. Moffitt*, 115 U.S. 487, 494 (1885)).  For this reason, we think that law of the case doctrine does not apply to second and successive petitions.  Instead, a body of law governing abusive and successive petitions provides a check on the litigiousness of habeas petitioners.  Therefore, we conclude that the district court erred in declining to consider Carballo's petition on this ground.

### IV.  Successive and Abusive Habeas Petitions

Respondents argue in the alternative that the court ought to dismiss the petition as successive and abusive.  On appeal, Respondents maintain that both the statutory modifications governing successive and abusive petitions enacted in the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1217 ("AEDPA"), and abuse of the writ doctrine present additional hurdles to consideration of the merits of Carballo's petition.

Sections 105 and 106 of the AEDPA amended 28 U.S.C. §§ 2255 and 2244, respectively, to create a default rule requiring courts to dismiss second or successive petitions except in certain limited circumstances.  By their terms neither of these "gatekeeping provisions" applies to petitions filed under section 2241.  *In re Hanserd*, 123 F.3d 922, 930 (6th Cir. 1997) ("A § 2241 motion would not be barred by the new restrictions on successive motions and petitions.").  Because section 2241 potentially allows a petitioner to evade these requirements, however, courts have attempted to define circumstances under which the AEDPA's new gatekeeping rules will bar a second or successive petition filed under section 2241.  *E.g.*, *Charles*, 180 F.3d at 757 (holding that a petitioner will receive "only one bite at the post-conviction apple" unless he can show either that he has newly discovered evidence or that a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable applies); *United States v. Barrett*, 178 F.3d 34, 57 (1st Cir. 1999) (allowing a

(2) there are adequate and reasonable provisions for the grant of parole; and (3) detention is necessary to prevent a risk of flight or a threat to the community.

*Chi Thon Ngo*, 192 F.3d at 397.

Until recently only the Tenth Circuit had departed from the position taken by the majority of circuits in reliance on *Mezei*. In *Rodriguez-Fernandez v. Wilkinson*, 654 F.2d 1382 (10th Cir. 1981) (2-1 decision), the court considered the habeas petition of a Mariel Cuban at a time prior to promulgation of the Mariel regulations or the enactment of statutory authority for the Attorney General to detain an excludable alien indefinitely in section 1226(e).  There, the Attorney General classified Rodriguez-Fernandez as suitable for immigration parole, but nonetheless continued his detention based on a governmental stay of all parole releases pending review of the entire situation created by the Mariel exodus without making an individualized determination of whether parole of Rodriguez-Fernandez was practicable or possible.  Construing the applicable statute as authorizing only temporary detention for a reasonable period to negotiate and effect deportation, the court sought to avoid what it considered serious constitutional problems by deciding the case on an interpretation of the INA. *Id.* at 1386, 1390.  Declining to draw a distinction between excluded aliens, regarded as standing at the border, and resident aliens, *id.* at 1387 n.3, the court ruled that excluded aliens enjoy the full protections of the Fifth Amendment:

> Thus, it would appear that an excluded alien in physical custody within the United States may not be "punished" without being accorded the substantive and procedural due process guarantees of the Fifth Amendment. Surely Congress could not order the killing of Rodriguez-Fernandez and others in his status on the ground that Cuba would not take them back and this country does not want them . . . .  Certainly imprisonment in a federal prison of one who has been neither charged nor convicted of a criminal offense is a deprivation of liberty in violation of the Fifth Amendment, except for the

court, unless expressly authorized by law, to review the determination of the political branch of the Government." *Id.* That Mezei remained indefinitely detained at Ellis Island, in the Court's estimation, did not alter his status as excludable or deprive him of any statutory or constitutional right. *Id.* at 215-16. Finally, the national security implications of Mezei's case justified a higher degree of caution than the typical case in which the Attorney General releases a resident alien pending proceedings to effect deportation. *Id. at 216.*

On the authority of *Mezei*, most courts have had little trouble turning aside habeas petitions brought by Mariel Cubans or other excludable aliens facing the prospect of indefinite or extended detention, albeit reaching this result with some variations in their reasoning. Some courts have construed the INS's Mariel regulations as establishing a series of one-year periods of detention followed by an opportunity to seek immigration parole. *E.g.*, *Barrera-Echavarria*, 44 F.3d at 1450. Other courts have deferred to the plenary power of the Congress to regulate immigration and of the President to conduct foreign affairs. *E.g.*, *Carrera-Valdez*, 211 F.3d at 1047-48. As for substantive due process, courts have found both that indefinite detention does not constitute punishment because of the government's underlying legitimate interest in protecting its citizens, *Gisbert*, 988 F.2d at 1442, and that Congress, not the Fifth Amendment, defines the extent of protections for excludable aliens, who after all are not—as a matter of law—within the United States. *Guzman*, 130 F.3d at 66; *Palma*, 676 F.2d at 103 (quoting *Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950)). Additionally, these courts have ruled that the Immigration and Nationality Act ("INA"), the INS's Mariel regulations, and the Supreme Court's decision in *Mezei* all displace international law. *E.g.*, *Guzman*, 130 F.3d at 66. As one court summarized the view of the majority of circuits:

[C]ase law holds there is no constitutional impediment to the indefinite detention of an alien with a criminal record under a final order of exclusion, deportation, or removal if (1) there is a possibility of his eventual departure;

petitioner asserting a claim of actual innocence to use section 2241 to circumvent the gatekeeping provisions).

In the immigration context, section 2241 plays a somewhat different role since neither section 2244 nor section 2255 applies to a petitioner who is not in federal custody pursuant to a conviction in court. Section 2244(a) provides:

No circuit or district judge shall be required to entertain an application for a writ of habeas corpus to inquire into the detention of a person *pursuant to a judgment of a court of the United States* if it appears that the legality of such detention has been determined by a judge or court of the United States on a prior application for a writ of habeas corpus, except as provided in section 2255.

(Emphasis added). Because the INS continues to detain Carballo based on administrative actions taken pursuant to the Mariel regulations, rather than the judgment of a court, section 2244(a) by its own terms does not govern his petition for a writ of habeas corpus. *Barapind v. Reno*, 225 F.3d 1100, 1111 (9th Cir. 2000). For similar reasons section 2255, limited to "prisoners in custody *under sentence of a court*," does not apply. Accordingly, section 2241 provides the only avenue for Carballo to have access to a federal court to challenge his continued custody. *See INS v. St. Cyr*, 121 S. Ct. 2271, 2280 (2001) ("At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of executive detention[.]").

Of course, this conclusion does not mean that unlike petitioners proceeding pursuant to sections 2254 or 2255, Carballo can expect a court to review his claims in second or successive petitions without limit. In fact, although section 2241 facially escapes the AEDPA's gatekeeping provisions, the general principles underlying these recently enacted limitations on the issuance of the writ inform a federal court's proper handling of second or successive petitions. In interpreting the effect of the AEDPA on its power to grant writs of habeas corpus filed as an original matter under section 2241, the Supreme Court has concluded:

The new restrictions on successive petitions constitute a modified res judicata rule, a restraint on what is called in habeas corpus practice "abuse of the writ." In *McCleskey v. Zant*, 499 U.S. 467 (1991), we said that "the doctrine of abuse of the writ refers to a complex and evolving body of equitable principles informed and controlled by historical usage, statutory developments, and judicial decisions." *Id.* at 489. The added restrictions which the Act places on second habeas petitions are well within the compass of this evolutionary process[.]

*Felker v. Turpin*, 518 U.S. 651, 664 (1996). Accordingly, even though the gatekeeping provisions do not expressly apply in the section 2241 context, "they certainly inform our consideration of original habeas petitions." *Id.* at 663. *See also Barapind*, 225 F.3d at 1111; *Gray-Bey v. United States*, 209 F.3d 986, 990 (7th Cir. 2000) ("[A] court in which a petition under § 2241 is filed must treat the new successive-petition rules as guideposts.").

Beyond these general principles the state of the law in the circuits remains unsettled regarding the circumstances under which a petitioner may bring a second or successive petition for a writ of habeas corpus under section 2241. We need not settle the matter today because, no matter what the standard, the doctrine of successive and abusive petitions bars consideration of Carballo's petition.

### A.  Second and Successive Petitions under the AEDPA

Under section 2241(a) as amended by the AEDPA, federal courts can only entertain second or successive petitions under the terms prescribed by section 2255. 28 U.S.C. § 2255 allows consideration of a second or successive petition in two limited circumstances: (1) when a petitioner presents newly discovered evidence sufficient to establish by clear and convincing evidence that no finder of fact would have found the petitioner guilty; or (2) in the case of a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable. Neither of these exceptions to the AEDPA's

implicitly authorized the Attorney General to detain excludable aliens indefinitely).

Courts upholding the constitutionality of the Attorney General's authority to detain excludable aliens indefinitely rely principally on *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953) (5-4 decision). In *Mezei*, the Supreme Court considered whether the Attorney General's permanent exclusion of an alien without a hearing constituted unlawful detention. *Id*. at 207. Having immigrated to the United States as a child, Mezei left the country in 1948 to visit his dying mother in Romania. Unable to obtain entry, he stayed in Hungary for over eighteen months and then attempted to return to the United States. Upon Mezei's arrival at Ellis Island, an immigration inspector ordered his temporary exclusion, which the Attorney General made permanent without a hearing on the basis of secret, undisclosed information that Mezei posed a security threat to the United States. Attempts to locate another nation to which Mezei could emigrate proved unsuccessful, and he challenged his detention on Ellis Island by seeking a writ of habeas corpus.

Recognizing the power to exclude aliens as a sovereign prerogative largely immune from judicial review, the Court noted that Congress had authorized the President through the Attorney General to impose additional restrictions on the entrance of aliens "during periods of international tension and strife." *Id.* at 210. That authority allowed the Attorney General to exclude aliens on the basis of confidential information without a hearing; therefore, the lawfulness of Mezei's detention turned on the constitutionality of this authority. *Id.* at 210-11. Although aliens legally or illegally within the United States enjoy limited due process protections when the government seeks to expel them, the Court distinguished their circumstances from those of an excluded alien who, even if paroled into the United States, remains at the threshold of initial entry by operation of law. *Id*. at 212-13. For such aliens, Congress defines all the process that is due. *Id*. at 212. Because executive action under this authority is final and conclusive, "it is not within the province of any

988 F.2d at 1446. We have adopted this interpretation. *Rosales-Garcia*, 238 F.3d at 715-16.[3]

Accordingly, former section 1226(e) provides the statutory basis for the INS's continued detention of Petitioner. Since immigration law without question defines Carballo's convictions as aggravated felonies within the meaning of former section 1226(e),[4] Petitioner faces potentially indefinite detention.

### 2. *Former Section 1226(e) and the Supreme Court's Decision in Mezei*

The overwhelming majority of circuits that have considered whether the former section 1226(e) constitutionally authorizes the indefinite detention of excludable aliens have upheld the statute. *Carrera-Valdez v. Perryman*, 211 F.3d 1046 (7th Cir. 2000); *Chi Thon Ngo v. INS*, 192 F.3d 390 (3d Cir. 1999); *Guzman v. Tippy*, 130 F.3d 64 (2d Cir. 1997) (per curiam); *Barrera-Echavarria v. Rison*, 44 F.3d 1441 (9th Cir. 1995) (en banc); *Gisbert v. United States Attorney Gen.*, 988 F.2d 1437 (5th Cir. 1993). *See also Fernandez-Rocque v. Smith*, 734 F.2d 576 (11th Cir. 1984) (rejecting constitutional challenges to indefinite detention arising from the denial or revocation of immigration parole); *Palma v. Verdeyen*, 676 F.2d 100 (4th Cir. 1982) (concluding that Congress had

---

[3]The IIRIRA further amended section 1226(e) and created new statutory bases for detention of aliens; but, because section 309(c)(1) of the IIRIRA limits these amendments to removal proceedings initiated after its effective date of April 1, 1997, they have no effect on this action.

[4]8 U.S.C. § 1101(a)(43), as in effect prior to enactment of the IIRIRA, defined "aggravated felony" to include "any crime of violence (as defined in section 16 of Title 18, not including a purely political offense) for which the term of imprisonment imposed . . . is at least 5 years." In turn, 18 U.S.C. § 16(a) defines "crime of violence" as "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another." Carballo's eight-year sentences for attempted murder and robbery and his five-year sentence for aggravated assault satisfy this definition.

limitations on second and successive petitions applies here. Therefore, under the AEDPA's standard, we could not entertain Carballo's petition.

### B. *Traditional Successive Petition Doctrine*

Notwithstanding Carballo's failure to satisfy all of the formal prerequisites for consideration of his second petition under the strictures of the AEDPA, we could arguably consider Carballo's claims under the traditional successive petition doctrine since the new gatekeeping provisions of the AEDPA merely "inform," rather than control, consideration of a second or successive petition under section 2241. Under the pre-AEDPA standard, when a court has denied a prior application for a writ of habeas corpus, that judgment will bar successive petitions if: (1) the earlier petition presented the same ground for relief, (2) the prior determination was on the merits, and (3) reaching the merits of a successive petition would not serve the ends of justice. *Sanders v. United States*, 373 U.S. 1, 15 (1963); *Lonberger v. Marshall*, 808 F.2d 1169, 1173 (6th Cir. 1987). Under the "ends of justice" component of this standard, an applicant can file a successive petition "upon showing an intervening change in the law." *Sanders*, 373 U.S. at 16-17. *See also Lonberger*, 808 F.2d at 1174.

In light of this court's recent decision in *Rosales-Garcia v. Holland*, 238 F.3d 704 (6th Cir. 2001) (holding that indefinite detention violates the Due Process Clause of the Fifth Amendment), we must consider whether "an intervening change in the law" allows consideration of Carballo's petition. For the reasons that follow, we think that the Supreme Court's subsequent opinion in *Zadvydas v. Davis*, 121 S. Ct. 2491 (2001), fatally undermines the authority of *Rosales-Garcia*. Accordingly, we conclude that even under the *Sanders* standard, Carballo's petition is barred.

### 1. *The Statutory Basis for Carballo's Detention*

We begin our analysis by examining whether the statute pursuant to which the INS continues to detain Petitioner authorizes indefinite detention. *See, e.g.*, *Crowell v. Benson*,

285 U.S. 22, 62 (1932) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.") (footnote omitted).    Prior to enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 ("IIRIRA"), 8 U.S.C. § 1226(e) authorized the Attorney General to detain excludable aliens indefinitely.  That section provided:

(1)    Pending a determination of excludability, the Attorney General shall take into custody any alien convicted of an aggravated felony upon release of the alien (regardless of whether or not such release is on parole, supervised release, or probation and regardless of the rearrest or further confinement in respect of the same offense).

(2)  Notwithstanding any other provision of this section, the Attorney General *shall not release such felon* from custody *unless* the Attorney General determines that the alien may not be deported because [a country "upon request denies or unduly delays acceptance of the return of any alien who is a citizen . . . thereof."  8 U.S.C. § 1253(g)].

(3)  If the determination described in paragraph (2) has been made, the Attorney General *may release* such alien *only after*—

(A)  a procedure for review of each request for relief under this subsection has been established,

(B)  such procedure includes consideration of the severity of the felony committed by the alien, and

(C)  the review concludes that the alien will not pose a danger to the safety of other persons or to property.

8 U.S.C. § 1226(e) (1994) (emphasis added).  In short, former section 1226(e) unambiguously authorized the Attorney General to retain custody of an excludable alien convicted of an aggravated felony unless he first determined both that the alien's native land has unduly denied or delayed deportation and that the alien will not pose a danger to the safety of people or property.

Congress enacted this provision in the Immigration Act of 1990, Pub. L. No. 101-649, § 504(b), 104 Stat. 4978, 5050. This statutory amendment took effect on November 29, 1990, and does not apply retroactively.  Nonetheless, its provisions govern Carballo's petition for a writ of habeas corpus.  In *Alvarez-Mendez v. Stock*, 941 F.2d 956 (9th Cir. 1991), the court considered the effect of the enactment of section 1226(e) on the habeas petition of a Mariel Cuban whom, like Carballo and all similarly situated aliens, the INS had adjudged excludable in 1980.  The court concluded that section 1226(e) governed petitions filed after its effective date even in the case of an alien determined to be excludable prior to that date.

Although the new section 1226(e) does not retroactively authorize any of the Attorney General's acts accomplished prior to the amendment, we are concerned here only with the legality of Alvarez-Mendez's present detention.  Because this case involves a petition for the writ of habeas corpus, and not a claim for damages for illegal detention, the only issue before us is whether Alvarez-Mendez's detention is illegal today.  Therefore, even if his detention was illegal prior to the 1990 Act, if that Act gives the Attorney General the authority to hold Alvarez-Mendez today, his present custody is not illegal and habeas corpus is not available.

*Id*. at 960.  Since the Ninth Circuit offered this interpretation of former section 1226(e), other circuits that have considered whether it governs the detention of aliens found excludable prior to its enactment have concluded that it does.  *Ho v. Greene*, 204 F.3d 1045, 1054-55 (10th Cir. 2000); *Gisbert*,